**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**JANE DOE,**

**Plaintiff,**

**v.** **No. 1:20-cv-01365-SMD-LF**

**LEWIS ROCA ROTHGERBER CHRISTIE LLP,**

**Defendant.**

**MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on Defendant Lewis Roca Rothgerber Christie LLP's ("Lewis Roca") Motion for Summary Judgment on Plaintiff's Underlying Claims Against Portsmouth Abbey School (Doc. 164). The Court has reviewed the parties' submissions, the record, and the relevant law. For the reasons below, the Motion is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

This case arises out of Plaintiff Jane Doe's claims for child sexual abuse against a well-known, Rhode Island-based boarding school, Portsmouth Abbey School, the institution that hired and retained Plaintiff's abuser, Michael Bowen Smith ("Smith"). Plaintiff attended Portsmouth Abbey from September 2010 to May 2014. In December 2020, Plaintiff filed a complaint against Portsmouth Abbey in the United States District Court for the District of Rhode Island, alleging that the school administrators failed to report and prevent the abuse despite receiving warnings. *See Doe v. Order of St. Benedict in Portsmouth, Rhode Island*, 717 F. Supp. 3d 220 (D.R.I. 2024). The

Rhode Island complaint asserted claims for sexual abuse, intentional infliction of emotional distress, negligent supervision, hiring, or retention, and failure to report suspected child abuse.

The District of Rhode Island ruled that Plaintiff's claims against the school were barred by the statute of limitations. *Id.* at 224. In December 2020, Plaintiff also filed this action for professional negligence, breach of contract, and breach of fiduciary duty against Defendant Lewis Roca, based on Lewis Roca's representation of Plaintiff in connection with her petition for an order of protection against Smith. *See* Doc. 1-2. Plaintiff alleges that Lewis Roca attorneys knew or should have known Plaintiff had potential claims against Portsmouth Abbey arising from the abuse but never advised Plaintiff of these claims or the relevant statute of limitations. *Id.* at 2. Plaintiff also alleges that Lewis Roca never disclosed that the law firm often defended the Catholic Church in claims brought by abuse survivors or explained that this presented a potential conflict of interest. *Id.* at 2–3.

**LEGAL STANDARD**

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1140 (10th Cir. 2023). The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this requirement is met, the nonmovant can defeat summary judgment by showing that there is a genuine dispute of material facts. *Id.* The nonmovant's response must "set forth specific facts by reference to affidavits, deposition transcripts, or other exhibits to support the claim." *Serna v. Colo. Dep't of*

*Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006). The Court then reviews the proffered evidence and, drawing all reasonable inferences in favor of the nonmoving party, determines whether the facts "establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

**DISCUSSION**

To recover on a claim of legal malpractice based on negligence, a plaintiff must prove three essential elements: (1) the employment of the defendant attorney; (2) the defendant attorney's neglect of a reasonable duty; and (3) the negligence resulted in and was the proximate cause of loss to the plaintiff. *Sharts v. Natelson*, 885 P.2d 642 (N.M. 1994). This Motion concerns the third element. Under New Mexico law, the plaintiff in a legal malpractice suit must prove this loss by demonstrating by a preponderance of the evidence that he or she would have prevailed on the underlying claim. *Encinias v. Whitener Law Firm, P.A.*, 310 P.3d 611, 616 (N.M. 2013). Here, the claims that Defendant failed to bring or advise Plaintiff to bring against Portsmouth Abbey form the "case within a case." Defendant moves for summary judgment as to Plaintiff's underlying claims against Portsmouth Abbey for intentional infliction of emotional distress ("IIED") and mandatory reporting.

**I. Undisputed Material Facts**

A party's statement of material facts must "set out a concise statement of all of the material facts as to which the movant contends no genuine dispute exists." D.N.M.LR-Civ. 56.1(b). The statements must be numbered and "must refer to particularity to those portions of the record upon which the movant relies." *Id.* A response must contain a concise statement of the material facts cited by the movant as to which the nonmovant contends a genuine issue does exist. *Id.* All

material facts set forth in the memorandum will be deemed undisputed unless specifically controverted. *Id.* The response may set forth additional facts other than those which respond to the memorandum which the nonmovant contends are material to the resolution of the motion. *Id.* Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the nonmovant relies. *Id.* The reply must contain a concise statement of those facts set forth in the response which the movant disputes or to which the movant asserts an objection. *Id.* Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact. *Id.* All material facts set forth in the response will be deemed undisputed unless specifically controverted. *Id.*

Defendant's Motion includes six "Undisputed Material Facts": On December 21, 2020, Plaintiff filed her first amended complaint against Portsmouth Abbey School in the United States District Court for the District of Rhode Island (the "Rhode Island complaint"). Def. UMF ¶ 1. The Rhode Island complaint alleged that Plaintiff was subjected to sexual abuse at Portsmouth Abey while she was a student between 2010 and 2014. Def. UMF ¶ 2. Plaintiff graduated from Portsmouth Abbey in June 2014. Def. UMF ¶ 3. The Rhode Island complaint alleged that Portsmouth Abbey officials were informed of the alleged abuse at different times between 2010 and spring 2015. Def. UMF ¶ 4. The Rhode Island complaint alleged that Portsmouth Abbey was responsible for failing to report that information as required under R.I. Gen. Laws § 40-11-3.[1] Def. UMF ¶ 5. The Rhode Island complaint also alleged that Portsmouth Abbey was liable for

[1] Defendant's Undisputed Material Facts refer to "40 R.I. Gen. Laws §§ 40-1-11 through -20, which do not exist in the current Rhode Island General Laws or the numbering in effect between 2010 and 2014. Def. UMF ¶ 5 will be treated as though it referred to R.I. Gen. Laws § 40-11-3, which is referenced in the Rhode Island complaint.

intentional infliction of emotional distress ("IIED") because it did not conduct a "full-scale investigation" of Plaintiff's claims in 2015; it did not report the information to law enforcement or other authorities; and that it took little to no action to prevent Smith's cyber-stalking of Plaintiff. Def. UMF ¶ 6.

Plaintiff does not dispute Defendant's undisputed material facts for purposes of this Motion but sets forth 58 Additional Facts. In reply, Defendant asserts that by failing to identify them as "Additional *Material* Facts" (emphasis added), Plaintiff has conceded they are immaterial and the Additional Facts therefore should be disregarded. Defendant cites no authority to support this position. While the Court declines to disregard Plaintiff's Additional Facts in their entirety, it is clear not all the Additional Facts are pertinent to Plaintiff's underlying claim IIED and mandatory reporting claims against Portsmouth Abbey, which are the only grounds challenged in this Motion. The Court therefore will incorporate only the Additional Facts as they become relevant to the Defendants' arguments below. Plaintiff's Additional Facts will be cited to as though they had been correctly lettered rather than numbered (e.g., 1 = A, 2 = B, 3 = C). Where Defendant has combined its replies to multiple Additional Facts into one sentence, the Court will cite to the page number.

## II. Intentional Infliction of Emotional Distress

Under Rhode Island law, a plaintiff must prove four elements to maintain a cause of action for intentional infliction of emotional distress ("IIED"): "(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe." *Champlin v. Washington Trust Co. of Westerly,* 478 A.2d 985, 989 (R.I. 1984). Defendant moves for summary

judgment on Plaintiff's underlying IIED claim by attacking the first three elements. Defendant's arguments largely focus on the contents of the Rhode Island complaint eventually brought by Plaintiff's current counsel. *See* Doc. 164 at 2 ("To prevail on her legal malpractice claims against Lewis Roca, Plaintiff must prove that she would be successful on her underlying claims against Portsmouth Abbey *as alleged in the Rhode Island Complaint*") (emphasis added).

With respect to the first element, Defendant argues that the Rhode Island complaint failed to allege—and the record does not support—that Portsmouth Abbey administrators acted intentionally or recklessly.[2] With respect to the second element, Defendant argues that the Rhode Island complaint failed to allege a causal connection between the administrators' conduct and Plaintiff's emotional distress. With respect to the third element, Defendant argues that "as alleged" in the Rhode Island complaint, the administrators' conduct does not rise to the level of extreme and outrageous conduct.

While Defendant is entitled to use the allegations, Defendant cites no authority for its position that Plaintiff is limited to the allegations in the Rhode Island complaint. The relevant inquiry is whether Plaintiff *could have* prevailed in a suit for, among other claims, IIED but for Defendant's negligence, not whether Plaintiff's subsequent counsel pleaded the requisite elements in the later-filed—and ultimately time-barred—Rhode Island complaint. The Court will analyze each of the challenged elements in turn.

[2] The parties do not dispute that under Rhode Island law an employer is responsible for the intentional torts of its employees where the employee acts "in the course of [their] employment and by express or implied authority from the employer." *See Drake v. Star Market Co., Inc.*, 526 A.2d 517 (R.I. 1987).

**a. Intentional or reckless conduct**

Defendant argues that the Rhode Island complaint failed to plead the requisite mens rea for Portsmouth Abbey officials. Doc. 164 at 6. In particular, Defendant points out that Plaintiff originally alleged *Smith* acted "for the purpose of causing Plaintiff to suffer emotional harm . . . or with a reckless or callous indifference for the likelihood that [his conduct] would cause Plaintiff distress," while only alleging that Portsmouth Abbey "was made aware of [Smith's] stalking behavior and took little to no action to prevent it from continuing to occur." Doc. 164-1 ¶ 70.

Plaintiff does not dispute that these excerpts are taken from the Rhode Island complaint, but this alone does not entitle Defendant to summary judgment. As noted above, the question is whether Plaintiff could have prevailed on her IIED claim against Portsmouth Abbey. With respect to intentional or reckless conduct, however, Defendant further asserts the record establishes Portsmouth Abbey did not act with the requisite mens rea to support a claim for IIED.

In response, Plaintiff points to evidence that (1) Portsmouth Abbey officials took no action in response to concerns about the relationship between Smith and Plaintiff, and discouraged other students from "spreading rumors; and (2) Portsmouth Abbey officials took steps to discourage Plaintiff from pursuing her claims against the school. McDermott, the head houseparent where Plaintiff was housed, observed Plaintiff spending a lot of time with Smith. Pl. UMF ¶ H.[3] McDermott also met with school prefects, who felt uncomfortable with Smith's conduct around

[3] Defendant does not dispute that Pl. UMF ¶ H is consistent with the cited evidence but disputes the materiality because it "does not show that Ms. McDermott witnessed any unusual behavior among Smith and Plaintiff that could have been the subject of a report."

Plaintiff, and McDermott promised to "handle it." Pl. UMF ¶ U;[4] Pl. UMF ¶ V;[5] Pl. UMF ¶ W.[6] Plaintiff asserts that McDermott took no action in response. Pl. UMF ¶ X.[7] Plaintiff asserts that McDermott protected Smith by discouraging students from "spreading rumors." Pl. UMF ¶ M.[8]

This evidence could support the conclusion that Portsmouth Abbey officials acted intentionally or recklessly. Therefore, there remains a question of fact on the issue of whether Plaintiff could have met the requisite mens rea requirement to support an IIED claim.

**b. Extreme and outrageous conduct**

Defendant argues that Portsmouth Abbey's conduct "as alleged" does not rise to the level of extreme and outrageous conduct. Doc. 164 at 8. Defendant points to the allegations in the Rhode Island complaint, which described Portsmouth Abbey officials' failure to take action of reports of Smith's cyberstalking, conduct a full investigation of Plaintiff's claims, or report Smith's behavior to law enforcement or other authorities.

Defendant cites three cases in support of the proposition that Portsmouth Abbey's alleged conduct does not rise to the level of extreme and outrageous: *Doe v. Yeshiva University*, 2023 WL

[4] Defendant disputes that school prefects met with McDermott "to report suspicions of a relationship" between Smith and Plaintiff, arguing that the testimony only shows that the prefects wanted to speak to McDermott "because of the amount of time Smith and Plaintiff were spending together during study hall or in public spaces on campus." Doc. 189 at 6.

[5] Defendant does not appear to dispute that McDermott met with school prefects, but dispute that the cited testimony shows the meeting occurred in winter 2013.

[6]

[7]

[8]

8236316 (S.D.N.Y. Nov. 28, 2023); *Wilcox v. Andalusia City Schools Board of Education*, 660 F. Supp. 3d 1167 (M.D. Ala. 2023); and *Weaver v. Deevers*, 180 N.E.3d 619, 629 (Ohio Ct. App. 2021). In *Doe v. Yeshiva University*, the university defendants were "alleged to have placed their concern for the reputation of the University over their concern for the rights and needs of Doe." But as the court recognized in dismissing the IIED claim, "[n]otably, this is not an IIED claim against the perpetrator of a rape or assault but against those who conducted a severely flawed investigation of the incident." Here, Plaintiff's underlying claim is against the perpetrator as well as his employer, Portsmouth Abbey.

In *Weaver v. Deevers*, the plaintiffs were school employees and the alleged outrageous conduct involved parents of students emailing school administrators, reporting allegations of bullying. The employees alleged that the school's "broadcasting" of the alleged defamatory statements and its "arbitrary management" of the subsequent investigation constituted extreme and outrageous conduct.

*Wilcox v. Andalusia City Schools Board of Education*, the only case alleging that a school took no action in response to reports of sexual misconduct by a school employee, also has limited applicability here. The plaintiff alleged that the school superintendent failed to vet the perpetrator or check his references; and that the superintendent was warned before the perpetrator started of his alleged misconduct at other schools. Here, the allegation is not that Portsmouth Abbey administrators failed to do their due diligence when hiring Smith, but that they failed to act on the misconduct and discouraged other students from reporting it. As to allegations that the superintendent in *Wilcox* failed to report the perpetrator's misconduct to the relevant authorities,

there was no evidence to show the superintendent knew about the underlying misconduct before the police were already involved.

Plaintiff responds that the record shows that all three factors used by Rhode Island courts in assessing extreme and outrageous conduct have been met: (1) the conduct itself, (2) the particular relationship of the parties, and (3) the known or knowable susceptibility of the plaintiff to emotional injury. *See* Doc. 167 at 17. Plaintiff counters with evidence of Portsmouth Abbey officials disregarding complaints about the relationship between Plaintiff and Smith. Plaintiff also points to her age at the time, the fact that she was a student at the school, and her status as a resident of a school that assumed responsibility for her in loco parentis—*i.e.*, facts showing a special relationship between the parties. In reply, Defendant stresses that Plaintiff "does not dispute" the contents of the Rhode Island complaint. As noted above, this alone does not entitle Defendant to summary judgment on an underlying claim.

**c. Causation**

Defendant's argument rests entirely upon paragraph 38 of the Rhode Island complaint, which alleged that Smith's conduct "caused" emotional damages. *See* Doc. 164 at 6. Defendant argues that because the Rhode Island complaint did not contain a corresponding paragraph alleging that Portsmouth Abbey "caused" emotional damages, Plaintiff could not have met the causation element. *Id.* In response, Plaintiff again relies on evidence that Portsmouth Abbey officials ignored or discouraged complaints regarding the relationship between Plaintiff and Smith and argues that if Portsmouth Abbey had taken action in response to these concerns, Plaintiff's trauma could have been addressed and treated earlier. *See* Doc. 167 at 16. Because a reasonable jury could find that Portsmouth Abbey's failure to act caused Plaintiff emotional damages, Defendant

is not entitled to summary judgment on Plaintiff's underlying IIED claim against Portsmouth Abbey.

**III. Mandatory Reporting Claim**

Defendant also moves for summary judgment on Plaintiff's underlying claim against Portsmouth Abbey for failure to report. The mandatory reporting law in effect between 2010 and 2014 required "any person who has reasonable cause to know or suspect that any child has been abused or neglected" to report the information to the "department of children, youth and families" within 24 hours. The statute defined "abused and neglected" child as a child "whose physical or mental health or welfare is harmed, or threatened with harm, when his or her parent or other person responsible for his or her welfare" mistreats the child. Section 40-11-2(12) defined "person responsible for child's welfare" as "the child's parent; guardian; any individual, eighteen (18) years of age or older, who resides in the home of a parent or guardian and has unsupervised access to a child; foster parent; an employee of a public or private residential home or facility; or any staff person providing out-of-home care (out-of-home care means child day care to include family day care, group day care, and center-based day care; and camps, whether licensed or unlicensed, to include programs operating during the day or overnight in the summer or during other breaks in the academic calendar)." *See Marold v. Fendetti*, No. 95-03210, 1997 WL 1526549 (R.I. Super. Ct. Aug. 28, 1997) ("A 'person responsible for the child's welfare' means the child's parent, guardian, foster parent, and employee of a public or private residential home or facility, or any staff person providing out-of-home care, including family day care, group care, and center-based day care.").

In 2016, the Rhode Island General Assembly amended the mandatory reporting law to add § 40-11-3.3, which provides, in relevant part: "Any person who has reasonable cause to know or suspect that any child has been the victim of sexual abuse by an employee, agent, contractor, or volunteer of an educational program as defined in § 40-11-2 shall, within twenty-four (24) hours, transfer that information to the department of children, youth and families, or its agent[.]" The 2016 amendment did not alter the definition of "abused and neglected" child. Nor did prior versions exempt school administrators from reporting child abuse or neglect, as all persons in Rhode Island are required to report.

Defendant argues that prior to the 2016 amendment, Plaintiff would not have met the definition of "abused and neglected child" as defined in § 40-11-2 because she was not abused by a "parent or other person responsible for [her] welfare." Defendant urges that the Rhode Island General Assembly only imposed reporting requirements for known or suspected sexual abuse by school employees through the 2016 amendment, and that the 2016 reporting requirement should not be read as retroactive.

In matters of statutory interpretation, the Supreme Court of Rhode Island has explained:

> When the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings. However, the plain meaning approach must not be confused with myopic literalism; even when confronted with a clear and unambiguous statutory provision, it is entirely proper for us to look to the sense and meaning fairly deducible from the context. Therefore, we must consider the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections.

*O'Connell v. Walmsley*, 156 A.3d 422, 426 (R.I. 2017) (internal quotations omitted).

The term "person responsible for [the child's] welfare" could well be read to include adults with authority over the child in question, such as a teacher or other school employee, particularly

in a boarding school setting where students are living away from their parents, under the school's supervision. However, the statute goes on to define "person responsible for child's welfare" as follows:

> "Person responsible for child's welfare" means the child's parent; guardian; any individual, eighteen (18) years of age or older, who resides in the home of a parent or guardian and has unsupervised access to a child; foster parent; an employee of a public or private residential home or facility; or any staff person providing out-of-home care (out-of-home care means child day care to include family day care, group day care, and center-based day care; and camps, whether licensed or unlicensed, to include programs operating during the day or overnight in the summer or during other breaks in the academic calendar).

R.I. Gen. Laws § 40-11-2(12).

Defendant argues that under this definition, even if Portsmouth Abbey officials had known about Smith's abuse of Plaintiff, that abuse did not fall within the scope of the law's reporting requirements during the relevant period. *See* Doc. 164 at 12. In response, Plaintiff stresses that Portsmouth Abbey employees were subject to mandatory reporting prior to the 2016 amendment *because* they "were responsible for Plaintiff's welfare *in loco parentis.*" Doc. 167 at 20. This appears to confuse the conduct (or suspected conduct) that triggered the mandatory reporting requirement with the individuals required to report. Both before and after the 2016 amendment, all persons in Rhode Island were subject to the mandatory reporting requirement—regardless of their relationship to the child—if they had knowledge or suspicion that a child was being abused or neglected by a parent, guardian, or other person responsible for that child's welfare. Prior to the 2016 amendment, *all* persons were required to report if they had reasonable cause to know or suspect that a child was "abused or neglected" by a "parent or other person responsible for his or her welfare." Following the 2016 amendment, *all* persons were also required to report if they had reasonable cause to know or suspect that a child "has been the victim of sexual abuse by an

employee, agent, contractor, or volunteer of an educational program." R.I. Gen. Laws § 40-11-3.3. In other words, the relevant inquiry is not whether Portsmouth Abbey employees were sufficiently responsible for Plaintiff's welfare to report suspected abuse, but whether Smith's abuse of Plaintiff constituted "abuse or neglect" by a "parent or other person responsible" for Plaintiff's welfare such that *any* person with knowledge of Smith's conduct was required to report it.

Plaintiff argues that Smith, in his role as a teacher at a boarding school, not only fell within the plain reading of "person responsible" for Plaintiff's welfare, but fit within the enumerated examples in § 40-11-2(1). *See* Doc. 167 at 19. First, Plaintiff argues that Smith was an "individual, eighteen (18) years of age or older" and had "unsupervised access to a child" (*id.* at 20); but this skips over the qualifying language that the individual "resides in the home of a parent or guardian," which Smith did not. Second, Plaintiff argues that Smith was "an employee of a [] private residential home or facility," because Plaintiff was a resident as well as a student at Portsmouth Abbey. *Id.* at 20. The statute does not further define "residential home or facility," but a review of Rhode Island cases interpreting "residential facility" in other contexts does not support Plaintiff's reading. *See, e.g.*, *Newport Sch. Cmte. v. R.I. Dep't of Educ.*, 316 A.3d 1159, 1161 (R.I. 2024) (discussing statute governing reimbursement for educational costs of children placed in residential facilities and listing "group homes, child caring facilities, [and] community residences" as examples of "residential facilities"); *In re Children Residing at St. Aloysius Home*, 556 A.2d 552, 553 (R.I. 1989) (noting that Department of Children and Their Families placed children at "residential facility for dependent and neglected children" "for social rather than educational purposes and contracts with the [facility] for child-care and residential treatment services").

The Court agrees with Plaintiff that the inclusion of "boarding schools" in the definition of "educational program" (*see* R.I. Gen. Laws § 40-11-2(6)) does not, on its own, exclude boarding school employees from "persons responsible for a child's welfare." However, the 2016 addition of § 40-11-3.3, covering sexual abuse of a child in an educational program, indicates the Rhode Island General Assembly intended to "close a loophole" in the then-existing reporting requirement. *See* Doc. 187-1 ("The General Assembly today approved legislation sponsored by Sen. Maryellen Goodwin and Rep. Marvin L. Abney to close a loophole in abuse reporting laws to ensure that schools report allegations of sexual abuse of children to the Department of Children, Youth and Families."). Because the mandatory reporting provision in § 40-11-3.3 was not in effect during Plaintiff's time as a Portsmouth Abbey student, Defendant is entitled to summary judgment on Plaintiff's underlying mandatory reporting claim against Portsmouth Abbey.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment on Plaintiff's Underlying Claims Against Portsmouth Abbey School (Doc. 164) is GRANTED IN PART and DENIED IN PART as set forth above.

IT IS SO ORDERED.

**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**